E-FILED
Wednesday, 23 March, 2022  01:58:16 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BRADLEY J. PIERSALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3306 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of | ) | |
| Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Bradley J. Piersall appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Piersall filed a Motion for Summary Judgment (d/e 15).  The Defendant Acting Commissioner (Commissioner) filed a Motion for Summary Affirmance (d/e 21).  Piersall filed a Reply Brief to Commissioner's Memorandum in Support of Motion for Summary Affirmance (d/e 22).  The parties consented to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States

---

[1] The Court takes judicial notice that Dr. Kilolo Kijakazi, Ph.D., is now the Acting Commissioner of Social Security.  As such, he is automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d).

Magistrate Judge and Reference Order entered March 22, 2021 (d/e 13).
For the reasons set forth below, the Decision of the Commissioner is
AFFIRMED.

## BACKGROUND

Piersall was born on May 9, 1980 and did not complete high school
and did not secure a GED.  Piersall previously worked as retail sales
attendant, cable helper, construction worker, and machinist helper. He has
not worked since September 1, 2011 (Onset Date).  Piersall was last
insured for Disability Benefits on December 31, 2017 (Date Last Insured).
Piersall suffered from degenerative disc disease of the cervical spine and
degenerative disc disease of the lumbar spine with L4-S1 herniations.
Certified Transcript of Proceedings Before the Social Security
Administration (d/e 9 and 10) (R.), 97, 670, 672, 678, 693, 699.  This Court
previously reversed the Commissioner's prior decision on Piersall's
application and remanded the matter for further proceeding.  Piersall v.
Berryhill, C.D. Ill. Case No. 17-cv-3172, Opinion entered August 15, 2018
(2018 Opinion).  R. 732-70.  Piersall brings this action for judicial review of
the denial of Disability Benefits after further proceedings before the Social
Security Administration.

## STATEMENT OF FACTS

### Evidence Submitted Before the Administrative Hearing

On August 28, 2011, Piersall was evaluated by a physical therapist. He had some reduced strength and range of motion in his shoulders, but otherwise had full strength and range of motion in his upper extremities. He had no problems with mobility, gait, balance, or activity tolerance; he had limited range of motion in his cervical spine; his posture had a cervical protrusion; and he had some tenderness to palpation in his spine. Spurling's sign was positive on the right for pain.[2]  R. 397.

On September 5, 2011, Piersall went to the emergency room with neck pain.  He reported that he had the pain for a month and it had increased on this day.  R. 462.  On examination, Piersall had reduced range of motion in his neck; he had no motor weakness in his left upper extremity; he reported parasthesias in his left hands and fingers; his back was normal; his lower extremities were normal; his neurological exam was normal, and his gait was normal.  R. 463-64.

The emergency room physicians ordered an MRI of his cervical spine without contrast.  The MRI showed multilevel disk disease and

---

[2] Spurling's test is a test for radiculopathy.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1900.

degeneration, most notably at C6-7.  The MRI showed moderate disk herniation contacting and deforming the cord producing moderate left-sided neuroforaminal encroachment. R. 471.

On September 15, 2011, Piersall saw Dr. Robert Kraus, M.D.  He reported improvement in his left arm pain and said he had some spasms and tightness in his upper chest that traveled into his upper left arm and forearm.  He had no pain in his right arm.  He said the symptoms may have occurred after striking his head on a beam at work six weeks earlier.  R. 531.  On examination, Piersall was 69 inches tall and weighed 252 pounds.  His muscle strength was 5/5 throughout.  Dr. Kraus assessed acute left C7 radiculopathy, left C6-7 disc rupture, and tobacco use.  Dr. Kraus said Piersall was somewhat improved and recommended physical therapy.  R. 531.

On October 13, 2011, Piersall saw Dr. Kraus.  His left arm pain was somewhat improved, but he had pain in his neck traveling into his triceps. He reported that physical therapy was helpful, and his strength improved. Piersall reported pain in his left thigh for six weeks.  He did not have any weakness in his legs.  On examination, Piersall had full strength in his

extremities.  Straight leg raising testing was negative bilaterally.[3]  Dr. Kraus

ordered an MRI of Piersall's lumbar spine.  R. 530.

On October 18, 2011, Piersall had an MRI of his lumbar spine which

showed herniation at L4-5 mildly indenting the thecal sac, extending

inferiorly to the rest behind the superior-posterior aspect of the L5 vertebra;

cervical herniation at L5-S1; and degenerative changes in the lumbar

spine, most evident at L4-5 and L5-S1.  R. 459, 529.

On October 20, 2011, Piersall saw Dr. Kraus and reported continuing

improvement in his arm and neck symptoms.  He had no arm pain at the

visit, but reported pain in his left buttock travelling down his left thigh into

his calf.  Piersall reported no weakness in his extremities.  On examination,

he had full strength in his extremities and straight leg raising testing was

negative bilaterally.  Dr. Kraus reviewed the October 18, 2011 MRI.  Dr.

Kraus referred Piersall for epidural steroid injections at L4-5 space of his

spine and said his prognosis was guarded due to the secondary leg pain

from the L4-5 disc rupture.  He discussed various options with Piersall.  R.

527.

---

[3] Straight leg raising is a test for lumbosacral nerve root irritation.  Straight Leg Raise Test - StatPearls - NCBI Bookshelf (nih.gov), visited February 1, 2022.

From September through December 2011, Piersall had physical therapy.  R. 391-429.  He stopped physical therapy because he did not have insurance.  R. 420.  On November 25, 2011, the physical therapist found that Piersall's lower extremities had range of motion within normal limits and 4+/5 strength; he had pain with moving his lumbar spine; he had no problems with his gait, balance, or joint mobility; his sensation was intact; he had pain on palpation of his lumbar spine at L4-L5; and he had a problem with activity tolerance.  R. 411.

On November 10, 2011, Piersall saw Dr. Kraus and reported ongoing lower back and left leg pain.  He had pain in his left buttock that traveled into the thigh, calf, and foot.  His neck was doing well.  On examination, Piersall had some tightness in the left leg with straight leg raising and he retained strength in his left leg.  Dr. Kraus assessed a left L4-5 disc rupture, L4-5 radiculopathy, resolved left C7 radiculopathy, and history of left C6-7 dis rupture.  Dr. Kraus recommended epidural injections at L4-5.  R. 525.

On November 15, 2011, January 11, 2012, and February 13, 2012, Piersall had left L4-5 transforaminal epidural steroid injections. R. 448-49, 452, 455. After the last injection, Piersall reported that his pain dropped from a 6/10 to a 2/10.  R. 449.

On November 23, 2011, Piersall saw Dr. Kraus.  He reported improvement after the injection, but he still had low back discomfort.  He had no neck or arm symptoms.  On examination straight leg raising testing was negative bilaterally.  Dr. Kraus referred Piersall to physical therapy for a conditioning program for his lower back.  R. 524.

On December 20, 2011, Piersall saw Dr. Kraus and reported pain from his left buttock down into his thigh.  His back was not bothersome at the time of the visit and he had one steroid injection completed.  On examination, Piersall had full strength in his lower extremities.  Dr. Kraus recommended Piersall complete an additional steroid injection and prescribed "maximizing conservative measures" before considering surgery.  R. 523.

On January 17, 2012, Piersall saw Dr. Kraus and reported that he had low back pain with morning stiffness.  He said his leg pain was resolved entirely.  On examination, he had full range of motion in his hip joints, straight leg raising testing was negative bilaterally, and he had symmetric strength in his lower extremity muscles.  Dr. Kraus assessed resolved L5 radiculopathy, left L4-5 disc rupture, degenerative disc disease at L4-5 and L5-S1, and a resolved C6-7 radiculopathy.  Dr. Kraus opined that Piersall was not a surgical candidate because he was too young and

recommended that he stop smoking and engage in weight loss or daily exercise.  Dr. Kraus stated the prognosis was guarded, "I do not think I can improve his back pain complaints with spinal fusion."  R. 521.

On March 13, 2012, Piersall saw Dr. Kraus.  Piersall said his back and leg pain were no better.  He had completed three steroid injections and the injections provided only temporary improvement.  He had pain mostly in the morning that traveled from his back down his left leg.  Piersall was uncomfortable.  On examination, straight leg raising was slightly positive on the left and negative on the right and he had full strength in his lower extremities.  Dr. Kraus reviewed the October 18, 2011 MRI.  Piersall was interested in surgery and  Dr. Kraus told him that the surgery would reduce his leg pain but not his back pain.  Dr. Krause advised Piersall that he was too young for the surgery and recommended that Piersall stop smoking, lose weight, and start a generalized activity program.  R. 519.

On March 19, 2012, Piersall saw Dr. Kraus.  He reported low back and leg pain and said the injections provided only temporary relief from the pain that radiated from his back to his left leg.  On examination, straight leg raising was slightly positive on the left and negative on the right, muscle strength in his lower extremities was 5/5, and he had no edema in his calf. Dr. Kraus reviewed the October 18, 2011 MRI and discussed options with

Piersall, including surgery.  Dr. Kraus told Piersall that the surgery was

designed to reduce leg pain, but he would likely still have back pain, and he

was too young for the surgery.  Dr. Kraus recommended smoking

cessation, weigh reduction, and a generalized activity program.  R. 519.

On March 20, 2012, Piersall had a CT scan of his lumbar spine

without contrast.  The scan showed central herniation and posterior

spondylosis at L4-5, similar to the October 18, 2011 MRI.  R. 446.

On March 27, 2012, Piersall went to the hospital emergency room

with complaints of left arm pain that started a month earlier.  The pain

started in the back of his neck and began traveling down his left arm and

into all of his left fingers.  He was prescribed Ultram (tramadol) and Flexeril

(cyclobenzaprine), but they did not help.  Rest improved the pain.  R. 436.

On examination, Piersall's neck was slightly flexed forward; he had no pain

upon range of motion of his shoulder joints; and he had 5/5 muscle strength

throughout his upper extremities.  The emergency room doctors reviewed

the October 18, 2011 MRI.  R. 436-37.

On March 27, 2012, Piersall also saw Dr. Kraus.  He reported back

and left leg pain radiating from his back down into his left thigh and calf

region.  Piersall said he had had the pain for 10 years and believed the

pain started after a snowmobile accident.  On examination, Piersall moved

comfortably; he had positive straight leg raising testing on the left and negative on the right; he had full strength in his lower extremities. Dr. Kraus reviewed the March 20, 2012, CT scan. Piersall agreed to proceed with back surgery. Dr. Kraus advised him that because he had spondylosis and because of his younger age, the pain may recur. Dr. Kraus advised weight reduction and smoking cessation for long-term management of his condition. R. 516.

On April 5, 2012, Piersall saw Dr. Kraus.[4] His left arm pain had somewhat improved and he thought his strength had also improved and that physical therapy was helpful. He reported pain in his left thigh for about six weeks, but he did not have any weakness in his left thigh. Dr. Kraus reviewed the March 20, 2012 CT scan and noted calcified disc herniation and/or spondylosis across the L4-5 and L5-S1 spaces, as well as some degenerative disc collapse across L4-5; but no pars defect, fracture or subluxation. Piersall elected to proceed with back surgery. Dr. Kraus told him again that the surgery was intended to relieve leg pain only. He also told Piersall that because of his young age and the spondylosis, the pain may recur. Dr. Kraus again recommended weight reduction and

---

[4] The notes from the March 27, 2012 emergency room visit and the April 5, 2012 office visit with Dr. Kraus were combined into one record.

smoking cessation for long-term management of his symptoms.  R. 436-38.

On April 5, 2012, Dr. Robert Kraus, M.D., performed a left L4-5 laminal

foraminotomy for decompression and removal of spondylitic ridge.  R. 545-

46.

On April 12, 2012, Piersall saw Dr. Kraus for a post-operative check.

Piersall reported that his leg pain had resolved.  He had discomfort in his

left buttock, but it was much better.  On examination, he had full strength in

his lower limbs; straight leg raising testing was negative; he had no pain

upon range of motion in his hips.  Dr. Kraus removed the staples from the

incision and said Piersall could increase lifting to 10-15 pounds.  R. 506.

On May 16, 2012, Piersall saw Dr. Kraus for a post-operative check.

Piersall reported no back or leg pain and that he took Norco

(acetaminophen and hydrocodone) for pain.  He did not report any

weakening in his legs and he had not tripped or fallen.  On examination,

Piersall moved without difficulty; he had no pain upon range of motion of

his hip joints; straight leg raising testing was negative bilaterally; and he

had no calf edema.  R. 505.  Dr. Kraus stated that Piersall could increase

his lifting limit to 25 pounds and recommended that he stop smoking and

begin a weight reduction program.  Dr. Kraus referred Piersall to physical

therapy.  R. 505.

On June 27, 2012, Piersall saw Dr. Kraus for a post-operative check. Piersall reported that he was no better after the surgery and reported ongoing low back pain.  Piersall did not have any numbness, weakness, or pain in his legs.  He took Norco daily for the back pain.  R. 504.  On examination, Piersall moved comfortably; he had full strength in his lower limbs; straight leg testing was negative; he had no pain upon range of motion of the hip joints.  Dr. Kraus assessed chronic low back pain, degenerative disc disease L4-5, L5-S1, tobacco use, obesity, and status post left L4-5 decompression surgery.  Dr. Kraus recommended that Piersall lose weight and stop smoking and opined that he could not provide a surgical solution to Piersall's back pain.   R. 504.

On August 2, 2012, Piersall saw pain specialist Dr. Atiq UR Rehman, M.D., at the Decatur, Illinois, Memorial Hospital Millennium Pain Center (Pain Clinic).  R. 478-82.  Piersall reported that he had pain in his left lower back that went down into his left hip and pain in his neck.  Piersall indicated that he previously had injections in his lumbar spine and reported one to two days of pain relief from the injections. The pain was 7/10 at the appointment.  It was worse with physical activity and better with medication. On examination, Piersall weighed 268.8 pounds; he had 5/5 strength in his lower extremities; straight leg testing was positive bilaterally; Patrick test

was positive on the right and negative on the left[5]; Gaenslen, POSH, and facet maneuvers were negative bilaterally[6]; sacral tenderness was positive bilaterally; trochanteric bursa tenderness was negative bilaterally.  Dr. Rehman assessed low back pain, left sacroiliac (SI) joint dysfunction, degenerative disc disease, post the April 5, 2012 back surgery and ordered an MRI of his lumbar spine.  R. 479-81.

On January 30, 2013, Piersall had imaging of his lumbar spine with and without contrast.  The imaging showed disk desiccation and disk space narrowing at L4-L5, with anterior disk bulging and posterior disk flattening. The disks at L4-L5 and L5-S1 were herniated. The L5-S1 herniation was moderately extruded and moderately indenting the thecal sac. R. 433, 566.

On February 4, 2013, Piersall saw Dr. Rehman for a follow-up on his lower back pain. R. 475-77.  He reported continued low back pain that radiated into his left leg.  Piersall did not have a primary care physician and did not have any pain medications for the last two weeks. Dr. Rehman stated, "Patient is wanting to get things started on having his pain treated."

---

[5]The FABERE/Patrick test is a maneuver of the hips and legs while supine to determine the presence or absence of sacroiliac disease.  Stedman's Medical Dictionary, 907150 "Patrick test," available on Westlaw Edge database, viewed February 2, 2022.

[6]The Gaenslen sign is pain on hyperextension of the hip with pelvis fixed by flexion of the opposite hip. Stedman's Medical Dictionary, 819100 "Gaenslen sign," available on Westlaw Edge database, viewed February 2, 2022.  The POSH is a posterior shear test to assess pain originating from the sacroiliac joint. POSH Test (thestudentphysicaltherapist.com), viewed February 2, 2022.  Facet loading maneuvers involve extending and rotating the spine to elicit a pain response.  Alexander, Sandean, and Varacallo, "Lumbosacral Facet Syndrome," Lumbosacral Facet Syndrome - StatPearls - NCBI Bookshelf (nih.gov), viewed February 2, 2022.

R. 475.  Piersall rated his pain at 6/10 and reported a back injury from a snowmobile accident.  Dr. Rehman assessed low back pain, left S1 joint dysfunction, degenerative disk disease, and history of April 5, 2012 back surgery.  Dr. Rehman prescribed Neurontin (gabapentin).  R. 476.

On March 14, 2013, Piersall saw Dr. David Gregory, M.D., as a new patient to establish primary care.  He reported low back pain.  Piersall was 69 inches tall, weighed 264 pounds and had a body mass index (BMI) of 39.  R. 484.  On examination, Piersall was in no acute distress; his neck was supple, with no masses; his back had normal curvature with no tenderness but had limited range of motion secondary to pain; he had full range of motion in his extremities with no deformities, edema, or erythema.  R. 484.  Dr. Gregory prescribed Flexeril and Norco and advised Piersall to quit smoking.  R. 485.

On April 15, 2013, Piersall saw Dr. Gregory.  His pain was "about the same; will be fine one day and then we'll (sic) sit down on the couch and will have sharp pain shooting down into his buttocks and leg."  On examination, his back had normal curvature and no tenderness but decreased range of motion secondary to pain; he had full range of motion in his extremities with no deformities, edema, or erythema; straight leg raising test was negative bilaterally.  Dr. Gregory recommended seeing Dr.

Kraus for further evaluation and recommended a low fat, low carbohydrate diet "given that he's not able to really exercise all that much".  R. 486.

On April 30, 2013, Piersall saw Dr. Kraus.  He reported low back pain and stiffness in the morning that improved during the day.  The pain, however, would become worse if he twisted or turned during the day.  He had intermittent left leg pain, but the leg pain was not limiting; he had no weakness in his legs.  On examination, Piersall rated his low back pain at 6/10; he had full strength in his lower extremities; straight leg raising tests were negative; and he had no pain on range of motion in his hips.  Dr. Kraus reviewed the January 30, 2013 MRI and compared it with prior imaging.  Dr. Kraus recommended weight reduction, smoking cessation, and a daily exercise program and opined that surgery would not improve his condition.  R. 491.

On September 18, 2013, Piersall completed a Function Report—Adult form (Function Report) with the assistance of a non-attorney representative Tama Weltzin. R. 280-91.  Piersall said he lived in a house with his children and his fiancé.  R. 282, 287.  Typically, he got up at 5:00 or 6:00 am, showered and dressed, woke up his children, ate breakfast and fed his children, took his children to school, ran errands, watched television, ate lunch, napped, did laundry, picked up his children after

school, helped them with homework, ate dinner with his family, gave his children baths, watched television, and went to bed about 9:00 p.m. R. 282.

Piersall said he had difficulty falling asleep and staying asleep because of his pain.  He had difficulty dressing himself and bathing himself because of his pain and had difficulty holding objects such as razors, silverware, and glasses.  He also had problems cutting food because of his hands. R. 283-84.

Piersall reported that he prepared meals daily, did laundry daily, and mowed his yard weekly.  He drove short distances because he could not sit in a car for long periods, and he had difficulty holding the steering wheel. He also had problems turning his head to check for traffic and he avoided driving in unfamiliar routes and heavy traffic due to anxiety.  R. 285-86.

Piersall fished one to two times a month, and he built radio-controlled cars once a month.  He fished where he could sit and did not need to walk long distances.  He had problems performing the fine motor skills needed to build radio-controlled cars and sometimes had problems concentrating while watching television.  He also often switched positions or got up while watching television. R. 283.

Piersall said his condition limited his ability to lift, squat, bend, stand, complete tasks, and use his hands. R. 282.  He avoided "lifting more than

10 pounds due to pain, numbness, tingling, muscle spasms, weakness,
and fatigue." R. 288.  He had difficulty standing for long periods and said he
could walk slowly for 10 to 15 minutes, but then needed to rest 20 to 30
minutes.  He climbed stairs slowly and held onto the railings and took
longer to complete tasks because he took frequent rest breaks.  He had
difficulty using his hands for fine motor skills, gripping, and grasping "due to
numbness, tingling, weakness, and fatigue." He had difficulty concentrating
because of his pain and also had problems remembering instructions.  R.
288-89.  Piersall had no difficulty getting along with others, including
supervisors, and could handle stress, but experienced increased anxiety
when he had changes in routine.  R. 289.

On November 19, 2013, Piersall saw state agency physician Dr.
Hima Atluri, M.D., for a consultative examination.  R. 537-41.  Piersall said
he had constant back pain and he could not stand for more than 15-20
minutes without stretching.  He could not sit for more than 30 minutes and
could not walk for more than a block.  He could manage walking at his
home as long has he went at a slow pace.  He could not run, and brisk
walking and brisk exercise was very hard.  He reported pain in his back and
neck and numbness and tingling in his fingers.  R. 537.

On examination, Piersall was 5 feet 9 inches tall and weighed 258 pounds.  Dr. Atluri found significant paraspinal spasms in Piersall's neck and that he had limited range of motion in his neck.  Piersall had normal movement in his shoulders, elbows, and wrists.  He had normal grip strength, normal fine motor movements in his hands and fingers, and no muscular atrophy in his upper extremities.  He had normal movement in his knees and ankles, no foot drop, and no muscle atrophy in his lower extremities.  Straight leg raising testing was abnormal with pain in the back of the thighs both standing and lying down.  Piersall had limited range of motion in his lumbar spine and severe paraspinal spasms in the lower lumbar area with no point tenderness.  He had moderate difficulty getting on and off the exam table and performing tandem walking.  Piersall could not heel walk, toe walk, squat, or hop on one leg.  He did not need an assistive device to walk.  Dr. Atluri assessed central obesity, cervical spine problem with paraspinal spasm, lower lumbar pain with abnormal straight leg testing and radiculopathic symptoms. R. 538-40.

On December 2, 2013, Piersall saw Dr. Gregory for a follow-up on his back pain.  Dr. Gregory stated,

> Mr. Piersall comes in today for follow-up of his low back pain.
> Things are about the same; evidently the neurosurgeon here in
> town basically told him there is nothing more that he could do

and the patient should have pain. Patients (sic) pain and problems or (sic) some such that he really cannot work, and he is currently still on disability with his job (so there is an income) however he still does not have any insurance and really can't afford even to get a second opinion on his back until he does have some form of insurance. His children are on "All Kids" but he and his wife evidently bring in too much money to qualify.

R. 543-44.  On examination, Piersall had no tenderness in his back and full range of motion in his extremities.  Dr. Gregory observed no localized neurological or physiological findings.  R. 543.

On December 11, 2013, state agency physician Dr. Towfig Arjmand, M.D., completed a Physical Residual Functional Capacity Assessment of Piersall.  R. 119-20.  Dr. Arjmand opined that Piersall could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; occasionally stoop, crouch, and crawl; but had no other physical limitations.  R. 119-20.

Dr. Arjmand noted that Piersall had bilateral carpal tunnel release surgery in 2001 and back surgery in 2012 at the L4-5 level.  Dr. Arjmand reviewed MRIs dated September 5, 2011, October 18, 2011, January 30, 2013, and November 2013.  R. 120.

On February 5, 2014, the Hartford Insurance Company wrote Piersall a letter (Letter).  R. 570.  Piersall's former employer Rathje Enterprises, Inc.

d/b/a Bodine Electric of Decatur, provided long term disability benefits coverage to its employees through Hartford Insurance Company.  The Letter stated that Piersall qualified for long term disability benefits on and after March 5, 2014. R. 570.

On March 28, 2014, Piersall saw Dr. David Gregory, M.D., for a follow-up on his back pain and disk herniation.  He reported that the pain was about the same.  On examination, Piersall's back had no tenderness, but decreased range of motion secondary to pain and stiffness. Piersall had full range of motion in his extremities and Dr. Gregory observed no localized neurological findings.  Dr. Gregory continued Piersall's pain medications and added Celexa (citalopram) for anxiety.  R. 542.

On June 5, 2014, state agency physician Dr. Young-Ja Kim, M.D. prepared a Physical Residual Functional Capacity Assessment of Piersall. R. 130-32. Dr. Kim's assessment agreed with Dr. Arjmand's December 2013 assessment.  R. 130-31.  Dr. Kim listed the same medical history and examinations mentioned by Dr. Arjmand.  R. 131.

On August 29, 2014, Piersall saw Dr. Gregory.  He was beginning to experience numbness/pain/tingling in his left leg down to his left foot.  Dr. Gregory stated,

> Patient states that he is not sure what to do about all of this; the neurosurgeon will not operate on him, and he is not really able to work.  Because of the back pain.  Any time he tries to lift anything, or do anything.  Regardless, he is still being denied by disability, because they believe he can do "some work."  The problem is, he is needing to take Percocet on a semi regular basis, and I would have to think that the narcotics would not place him in a category where he could drive on a consistent basis, nor be considered to be unimpaired on a consistent basis. I'm not sure why the decision was made the way it was made, but I told him that I would be more than happy to assist him with a letter, if it is deemed necessary.

R. 576.  On examination, Piersall's extremities showed no cyanosis, clubbing, or edema.  He had limited range of motion in his lumbar spine secondary to pain and had a weakly positive straight leg raising test on the left.  R. 576.

On February 6, 2015, Piersall saw Dr. Gregory.  He reported no worsening of his back pain or radiculopathy symptoms.  On examination, Piersall had no edema in his extremities, and he had moderate to severe decreased range of motion in his lumbar spine. R. 577.

On September 11, 2015, Piersall went to the hospital emergency room with neck and left shoulder pain.  He reported that he hurt his neck at work two years ago and an MRI showed two ruptured discs.  He reported that the doctors at that time said they could not perform surgery on his neck.  He had physical therapy and injections in his neck, but the shots did not give him any relief.  He did not have a primary care physician.  R. 655.

On examination, Piersall was oriented with a normal affect; he was tender in his neck and lumbar spine; he had limited range of motion in his spine; he had no gross motor deficits.  The emergency room physicians prescribed pain relievers and discharged him.  His condition had improved. R. 657.

On October 9, 2015, Piersall saw Dr. David Oligschlaeger, D.O. as a new patient.  R. 579-80.  Piersall reported a long history of back issues and said he wanted further treatment.  On examination, Piersall's gait and station were normal.  Dr. Oligschlaeger assessed chronic back pain greater than three months duration and ordered a lower extremity electromyogram (EMG). R. 580.  On November 4, 2015, Piersall had an EMG study of his lower extremities and the test results were normal. R. 581-82.

On November 12, 2015, Piersall saw Dr. Oligschlaeger.  R. 585-87. He continued to have spasms and back pain and did not sleep well due to the pain.  Piersall reported his activities were limited because when he became active "very shortly then he'll begin having pain."  R. 585.  On examination, Piersall was oriented and in no acute distress.  He had normal mood and affect.  Dr. Oligschlaeger assessed chronic pain greater than three months and ordered physical therapy and prescribed Cymbalta (duloxetine).  Dr. Oligschlaeger noted, "He is not requiring narcotics for

pain control at this point and hopefully we can continue that.  We'll add some Flexeril for bedtime use."  R. 586-87.

On January 8, 2016, Piersall saw Dr. Oligschlaeger.  Piersall reported that he experienced pain down his arms during physical therapy when he was supporting himself and had pain in his legs when he sat for extended periods.  He had some improvement from the Flexeril but not the Cymbalta. R. 595.  On examination, Piersall was oriented and in no acute distress. He had a normal mood and affect.  Dr. Oligschlaeger assessed chronic pain greater than three months, cervical radiculopathy, and radiculopathy in the lumbosacral region.  R. 596.  Dr. Oligschlaeger increased the Cymbalta dosage, renewed the Flexeril, and ordered MRIs of Piersall's cervical and lumbar spine.  R. 597.

On January 13, 2016, Piersall had MRIs of his lumbar and cervical spine.  R. 565-68.  The MRI of the lumbar spine showed herniated discs at L4-5 and L5-S1, with greater degenerative changes at L4-5 than at L5-S1. R. 565.  The MRI of the cervical spine showed a herniated, bulging disc at C6-C7 mildly impinging on the spinal cord at C6-C7.  The bulging at C6-C7 and C5-C6 was greater than at other cervical levels.  There was also foraminal encroachment at C3-C4 with uncovertebral joint hypertrophy, disk bulge, and broad-based herniation. R. 567-68.

On February 15, 2016, Piersall saw Dr. Oligschlaeger.  R. 609-11.
Piersall complained of continuing back pain and reported that the Cymbalta
did not improve his pain.  He stopped taking it because it caused bowel
issues.  On examination, Piersall was oriented and in no acute distress; his
mood and affect were normal; his gait and station were normal.  R. 610.
Dr. Oligschlaeger prescribed sertraline HCL (Zoloft) instead of Cymbalta
and stated he would fill out papers from the Social Security Administration.
R. 611.

On March 10, 2016, Piersall started physical therapy.  R. 635-37.  He
reported stiffness in his neck and lumbar spine and rated his pain as 6/10.
He reported problems sleeping.  He currently could engage in household
activities.  The physical therapist assessed decreased range of motion,
decreased strength, and decreased activity tolerance. R. 637.  Piersall
attended physical therapy sessions on March 16, 2016, March 18, 2016,
March 24, 2016, March 29, 2016, March 31,2016, April 5, 2016, and April
7, 2016. R. 638-47.  He showed some improvement.  On April 7, 2016,
Piersall reported that his pain was not as sharp and not constant.  R. 646.
He still had decreased range of motion, decreased strength, and decreased
activity tolerance.  His therapy goals were unmet.  R. 646.  The therapist
stated that Piersall would benefit from skilled rehabilitation and that therapy

would be discontinued because Piersall wanted to return to his doctor "to see what he plans to do next."  R. 647.

On April 19, 2016, Piersall saw advanced practice nurse (APN) Kathryn A. Naron, CNP, at the Pain Clinic.  R. 647-51.[7]  He reported constant pain in his lower back and buttocks, mostly on the left.  He said "Sitting, standing, daily activities, and everything makes the pain worse." He reported that he used a TENS unit with little relief and received little relief from injections.  He had neck pain and had difficulty moving his head up and down.  R. 647.  On examination, Piersall was in no acute distress; he had a normal gait; he had paraspinal tender points but no spinal tender points; he had sub-scapular tenderness bilaterally; and he had 5/5 strength throughout his neck, shoulders, and upper extremities.  R. 649-50.  Naron assessed low back pain, left SI joint dysfunction, degenerative disc disease, history of surgery at L4-5, neck pain, multi cervical disc bulges and cervical spondylosis.  R. 650.  Naron recommended injections in the cervical spine.  Dr. Rehman met with Piersall during the office visit and reviewed Naron's care plan.  R. 651.  On April 28, 2016 and May 12, 2016,

---

[7] Naron's credential is as a certified nurse practitioner, CNP.  The notes state, however, that she was an advanced practice nurse,
APN.  R. 647.

Dr. Rehman administered interlaminar cervical epidural steroid injections into Piersall's cervical spine.  R. 651-53.

On May 11, 2016, Dr. David Oligschlaeger completed an "Absenteeism as it Relates to Employment" form and a "Social Security Administration Listing of Impairments" form. R. 613-14.  The Social Security regulations contain a list of medical impairments that are so severe that an unemployed person is disabled regardless of the person's age, education, or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Part 404 Subpart P, Appendix 1.  The listed impairments are referred to individually as a "Listing," and collectively as the "Listings."  Dr. Oligschlaeger opined that Piersall had evidence of root compression and positive straight leg testing, but his condition did not meet Listing 1.04 for disorders of the spine.  R. 614.  Dr. Oligschlaeger also opined that, if employed, Piersall would miss work two or more days per month due to his back and neck problems.  R. 613.

On May 27, 2016, Piersall saw APN Naron.  The injections in his cervical spine did not relieve his pain, but he had "a little better" range of motion.  He said the pain was constant, but worse when he bent over, stood up straight, or stood too long.  He reported shooting pain when he reached for objects and said he felt worse after his last set of physical

therapy sessions.  Piersall said the stretches recommended by physical

therapy helped.  He also reported pain in his low back down to his thighs

with the worst pain in his left leg.  He said Flexeril helped with the pain, but

Tylenol and Motrin did not.  R. 1018.  Naron recommended injections in his

neck and prescribed Lyrica.  R. 1020.

On June 16, 2016, Piersall saw APN Naron.  Piersall walked with a

steady gait as he arrived.  He said his insurance would not approve Lyrica

and stated that he did not want more injections.  He wanted a prescription

for Norco.  R. 1021.  On examination, Piersall weighed 291 pounds and

had a BMI of 42.95.  R. 1022.  Naron recommended injections and Piersall

refused.  Naron told Piersall that if she prescribed opioids, she needed to

see improvement in weight loss, range of motion, and an increase in daily

activities.  Naron gave Piersall for his review a required contract for

prescribing narcotics.  She prescribed nortriptyline (Pamelor).  R. 1023.

On July 14, 2016, Piersall saw advanced practice nurse Keith

Cermak, APN, at the Pain Clinic.  He reported neck and shoulder pain, low

back pain that radiated down into his hips and into his left thigh to his knee.

He rated his pain at 5-6/10 at rest and said the Pamelor and Flexeril did not

help much with the pain.  R. 1024.  He signed the opioid agreement.

Cermak gave Piersall a one-time prescription for Norco and told Piersall

that he had to complete a psychological review to receive any more prescriptions for opioids.  R. 1026.

On August 12, 2016, Piersall saw APN Cermak.  His neck and shoulder pain were better, but not his pain in his low back that radiated down to his left thigh.  He leaned forward on the examining table to relieve his pain.  Piersall said he tried to become more active "but [activity] increases the pain."  He said the meds relieved some of his pain and reported no side effects except mild drowsiness.  R. 1027.  On examination, range of motion was normal, lumbar spinal tender points were present, but lumbar paraspinal tender points were not present.  He had tenderness in the left SI joint, trochanteric bursitis on the left, and positive facet maneuvers bilaterally.  Straight leg raising was negative bilaterally. He had a positive FABER/Patrick sign on the left.  Gaenslen sign and POSH were not present.  He had normal strength throughout his lower extremities and his sensation in his left lateral thigh was diminished.  R. 1029-30.  Cermak refilled the Norco prescriptions for low back pain due to lumbar post laminectomy syndrome and also recommended and Piersall agreed to additional injections.  R. 1032.  On September 8, 2016, Dr. Rehman administered injections in Piersall's left SI joint and trochanteric bursa.  R. 1032-33.

On September 19, 2016, Piersall saw his primary care provider Dr. Oligschlaeger.  He complained of right shoulder pain and said the pain started two weeks earlier when he reached up to catch a cell phone and felt a strain with some popping and cracking.  The day before the visit, his son gave him a hard "high five" hit.  He felt popping and cracking again and felt pain since.  He reported difficulty raising his right shoulder due to pain.  R. 1166.  On examination, Piersall was oriented and in no acute distress; his gait and station were normal; he was tender over the front of his right shoulder and pectoral area; he had a tender point over the midpoint of the clavicle; he had pain with active range of motion and minimal pain with passive motion up until his elbow was raised above his shoulder.  R. 1167.  Dr. Oligschlaeger assessed acute right shoulder pain and ordered an x-ray of the right shoulder.  R. 1168.

On September 29, 2016, Piersall saw APN Cermak.  Piersall reported that the September 8, 2016 injections provided pain relief for one and a half to two weeks and currently provided 30 to 40 percent relief.  He continued to report low back pain that went down to the left knee, neck pain that radiated into both shoulders, and right shoulder pain for two months.  He said an x-ray showed no structural problems.  He could not reach out to pour milk, and he could not sleep on his right shoulder.  It was painful to let

the right arm hang down.  R. 1033.  On examination, Piersall had positive lumbar facet loading maneuvers.  R. 1035.  Cermak scheduled more injections.  R. 1035-36.  On October 14, 2016, Dr. Rehman administered bilateral lumbar facet medial branch blocks at L4-5 and L5-S1.  R. 1036.

On November 11, 2016, Piersall saw APN Cermak.  He said he got no relief from the October 14, 2022 lumbar branch blocks and reported a new pain in his tailbone in addition to his low back and left leg pain.  He had some drowsiness with his medications.  R. 1037.  Cermak also scheduled more injections.  R. 1040.  On December 19, 2016, Dr. Rehman administered a caudal epidural steroid injection for lumbar disc bulging.  R. 1040-41.

On January 4, 2017, Piersall saw APN Cermak.  Piersall arrived with a steady gait and said the December 19, 2016 injection provided 50 percent relief for five days.  He reported getting "a shock that shoots down my leg."  He reported that his constant low back pain returned when he was wrapping presents and he felt like he was walking differently.  R. 1041.  Cermak told Piersall that injections were no longer an option and discussed the possibility of a spinal cord stimulator.  Piersall would talk to his primary care provider to obtain a referral to a neurosurgeon.  Cermak continued the Norco prescription.  R. 1043.

On February 22, 2017, Piersall saw Dr. Oligschlaeger for a referral to a neurosurgeon for a second opinion regarding the possibility of further surgery.  R. 1163.

On March 2, 2017, Piersall saw Dr. Oligschlaeger.  He reported numbness in his arms and continuing back and right shoulder pain.  R. 1160.  On examination, Piersall was oriented and in no acute distress; his mood and affect were normal.  Dr. Oligschlaeger did not record any musculoskeletal findings in his examination notes and ordered an EMG study of Piersall's upper extremities.  R. 1161.

On March 23, 2022, Piersall had the EMG study performed.  The study showed bilateral carpal tunnel syndrome, moderately severe on the left and mild to moderate on the right, with no evidence of cubital tunnel syndrome, cervical radiculopathy, plexopathy, or disease at the muscle level.  R. 1196.

On April 4, 2017, Piersall saw APN Cermak.  Piersall said the Norco and nortriptyline helped with the pain and reported no side effects.  He continued to have low back pain that radiated into his left leg.  Piersall said his leg pain "comes/goes."  He still had neck pain and rated his pain at rest at 4/10 and his pain on activity at 8/10.  R. 1044.  Cermak scheduled another cervical epidural steroid injection (CESI).  Cermak stated,

> Schedule for CESI; Pt has had in the past with excellent
> sustained relief greater than 50% that lasted over 3 months and
> an increase in abilities to complete adl's and able to stand and
> walk for extended periods of time due to decreased pain. Pt
> feels that this is the same pain and is having difficulty with
> these activities again.

R. 1047.[8]  On April 13, 2017, Dr. John P. Braodnax, M.D., of the Pain Clinic

administered a cervical epidural steroid injection to Piersall.  R. 1051.

On April 27, 2017, Piersall saw APN Cermak.  He had a steady gait

when he arrived and said the CESI injection took away the pain on the front

side of his collarbone, but pain in the back of his neck into his shoulder

blades still bothered him.  He rated the pain relief at 60 percent and said

the Norco and nortriptyline continued to help with his pain.  He did not have

any side effects.  Piersall denied having headaches, paresthesia, or loss of

motor function.  R. 1056, 1058.  Cermak scheduled facet block injections in

Piersall's cervical spine.  R. 1058.

On May 16, 2017, Piersall saw APN Cermak.  Piersall said he got no

relief from the facet block injections, and he said the pain in his neck

actually worsened.  He also continued to have pain in his left hip that

radiated down to his ankle.  He said he could not put any weight on his left

---

[8] ADL stands for activities of daily living.  See e.g., 20 C.F.R. 404.1529.

leg.  R. 1063.  Cermak prescribed gabapentin and referred Piersall for aqua therapy.  R. 1065.

On June 20, 2017, Piersall saw APN Cermak.  Piersall complained of neck and shoulder pain that radiated into his arms and reported mid back pain.  His medications helped with the pain and he did not have any side effects.  Cermak noted that Piersall underwent carpal tunnel release surgery in May 2017.  On examination, Piersall had multiple tender trigger points in the cervical region, with palpable taut bands of muscle in the trigger points regions.  Referred pain could be reproduced with stimulation of the trigger points.  Cermak recommended trigger point injections.  R. 1066-68.  Cermak gave Piersall 10 trigger point injections in the cervical, trapezius, and rhomboid muscles.  R. 1068-69.

On July 13, 2017, Piersall saw APN Cermak.  He reported neck and shoulder pain that radiated into his arms and mid back pain.  His medications helped with the pain and he had no side effects.  On examination, Piersall had multiple tender trigger points in the cervical region, with palpable taut bands of muscle in the trigger points regions.  Referred pain could be reproduced with stimulation of the trigger points.  Cermak recommended trigger point injections.  R. 1074-76.  On July 13,

2017, Dr. Ricardo Vallejo, M.D., of the Pain Clinic gave Piersall injections in the SI joint and the trochanteric bursa.  R. 1077.

On August 2, 2017, Piersall had an MRI of his lumbar spine.  The MRI showed postsurgical and multilevel degenerative changes in the lumbar spine with disc herniation seen at L4-L5 and L5-S1.  The changes were similar in extent and distribution to prior exam.  R. 1190.

On October 11, 2017, Piersall saw APN Cermak.  He reported neck pain that radiated into his shoulders and low back pain that radiated into his left thigh.  Raising his left arm caused pain in his left shoulder and he had muscle spasms in his legs and arms.  Piersall reported occasional drowsiness, dizziness, and lack of energy from gabapentin.  He also said the gabapentin was not working.  R. 1078.  Cermak scheduled a CESI and increased his Flexeril dosage.  R. 1081.

On October 11, 2017, Piersall saw APN Cermak.  Piersall reported neck pain that radiated into his shoulders and low back pain that radiated into his left thigh.  Raising his left arm caused pain in his left shoulder and he had muscle spasms in his legs and arms.  Piersall reported occasional drowsiness, dizziness, and lack of energy from gabapentin.  He also said the gabapentin was not working.  R. 1086.  Cermak scheduled a CESI and increased his Flexeril dosage.  R. 1089.

On October 25, 2017, and December 19, 2017, Dr. Francesco Vetri, M.D., of the Pain Clinic gave Piersall a cervical epidural steroid injection. R. 1090, 1092.

On January 29, 2018, Piersall saw advanced practice nurse Sheila Mara, APN, CNP, in the Pain Clinic.  He reported 60 percent pain relief from the October 25 and December 19, 2017 injections.  He continued to have left lower side pain and rated the pain at 8/10.  His TENS unit was not giving much relief.  Piersall had spinal and paraspinal tender points and tenderness on the left side of his SI joint and trochanteric bursa.  Mara noted that Piersall received 50 percent pain relief from the October 15, 2017 injection, 70 percent pain relief from the July 13, 2017 injections, 60 percent relief from the April 13, 2017 injection, and 50 percent relief from the December 19, 2016 injection.  On January 29, 2018, Dr. Rehman gave Piersall left SI and trochanteric bursa injections.  R. 1094-97.

On March 1, 2018, Piersall saw advanced practice nurse Angela Birdsell, APN, at the Pain Clinic.  He reported 60 percent pain relief from the January 29, 2018 injection and stated he still had some shooting pains down his left leg but not as often, and the pain was not as intense.  He had pain in his left foot like it was broken and also reported neck pain.  He occasionally had numbness in his left foot if he sat too long.  He denied any

side effects from his medications.  R. 1098.  On examination, Piersall had cervical and thoracic tenderness to palpation of trigger points.  R. 1100. Birdsell scheduled cervical and thoracic trigger point injections and continued Piersall's medications.  R. 1101.

On March 22, 2018, Dr. Vetri gave Piersall 12 trigger point injections along the trapezius, cervical paraspinal, rhomboid, and thoracic paraspinal muscles.  R. 1101-02.

On April 10, 2018, Piersall saw APN Birdsell.  He said the trigger point injections provided 60 percent relief to the middle of his shoulder blades.  He rated his neck pain at 7/10 and said his medications sometimes caused drowsiness.  R. 1102.  On examination, Piersall had cervical spinal and paraspinal tender points.  Hoffman's sign and Spurling's tests were both negative.[9]  He had 5/5 strength throughout his upper extremities.  His sensation in his upper extremities was intact to light touch.  R. 1104. Birdsell reviewed the September 5, 2011 cervical MRI and the January 13, 2016 lumbar MRI.  Birdsell scheduled a cervical epidural steroid injection. R. 1105.  On April 24, 2018, Dr. Vetri gave Piersall a cervical epidural steroid injection.  R. 1114-15.

---

[9] Hoffman's sign is a test for reflexes in the fingertips.  Dorland's, at 1712-13.

On May 8, 2018, Piersall saw advanced practice nurse Birdsell.
Piersall said the April 24, 2018 injection gave him 60 percent relief, and the
relief was still lasting.  He reported pain in the back of his neck radiating to
his shoulders and lumbar back pain sometimes radiating to his knees.
Birdsell said Piersall was getting adequate pain relief.  R. 1115.  On
examination, Piersall weighed 295 pounds and had a BMI of 43.56.  R.
1117.  Birdsell refilled his prescriptions.  R. 1118.

On July 2, 2018, Piersall saw Dr. Oligschlaeger complaining of
palpitations.  On examination, Piersall was oriented, had a normal mood
and affect, and had no acute distress.  His pulmonary and cardiovascular
exams were normal.  Dr. Oligschlaeger ordered an EKG and a 48-hour
halter monitor.  R. 1151-52.

On July 6, 2018, Piersall saw APN Birdsell.  He rated his pain at 6/10
and complained of neck and shoulder pain.  R. 1119.  On examination,
Piersall had cervical, facet, and paraspinal tenderness.  Hoffman's and
Spurling's tests were negative.  He had 5/5 strength in his upper
extremities.  R. 1121.  Birdsell prescribed Lyrica and discontinued the
prescription for gabapentin.  She also scheduled a cervical epidural steroid
injection.  R. 1122.

On August 3, 2018, Piersall saw APN Birdsell.  He reported that the medications were helping with his pain.  He believed Lyrica was helping as he did not have as much burning pain in the morning.  He could "walk" off some of the pain and reported some drowsiness from the medication.  R. 1123.  Birdsell renewed his medications.  R. 1126.

On August 21, 2018, Piersall Dr. Eliezer Soto, M.D., of the Pain Clinic, gave Piersall a cervical epidural steroid injection.  R. 1134.

On September 5, 2018, Piersall saw APN Birdsell.  Piersall said the August 21 injection gave him 50 percent pain relief for about three to four days.  He looked up quickly on August 25, 2018 and felt a pop in his neck. He rated his pain at 6/10, but the pain was not constant as it was before. He said a burning pain in the middle of the neck "comes and goes."  R. 1135.  On examination, Piersall had cervical spinal and paraspinal tender points;  Hoffman's sign and Spurling's test were negative; he had facet joint tenderness; his sensation was intact in all his extremities; he had full range of motion; he had 5/5 strength throughout his upper extremities.  R. 1137. Piersall had no numbness, tingling, or weakness.  Birdsell renewed his prescriptions.  R. 1138-39.

On October 4, 2018, Piersall saw APN Birdsell.  He rated his pain at 6/10 radiating from his neck to his shoulders and said his medications gave

him 60 percent pain relief.  The medications also made him drowsy "but it is getting better."  R. 1139.  Birdsell renewed his prescriptions.  R. 1142-43.

## The Evidentiary Hearing

On February 14, 2019, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 688-724.  Piersall appeared in person with his attorney.  Vocational Expert Sherman Johnson, Sr., also appeared.  R. 690.

Piersall testified first.  He lived with his wife and three sons ages 17, 12, and 11 years in a one-story house without a basement.  R. 696-97.  He had a driver's license and drove his children to and from school every day.  The trip took ten minutes as the school was "like two blocks down the road."  R. 697.  Piersall did not drive long distances because he had difficulty turning his head from side to side.  He said that turning his head from side to side caused pain to flare up in his neck and shoulders and he also got a headache when the neck pain flared up.  Piersall said that he turned his whole body to look in another direction, rather than turn his head, to avoid the pain flare up.  R. 698-99.

Piersall said that on a daily basis he woke up at 5:00 a.m. to 6:00 a.m., he performed stretches that he learned in physical therapy sessions, and then went to the kitchen and made coffee.  He had to use both hands

to hold objects like coffee cups because he dropped things "all the time."
After the coffee was ready, he sat in his lift chair on a heating pad.  He
woke his children up at 6:30 a.m.  At 7:00 a.m., he started the truck and
drove his children to school.  Once back at home, he sat in his lift chair, ate
some toast, and thereafter alternated between sitting and walking.  He
occasionally performed more stretches.  He made lunch for himself and
picked up his children from school around 3:00 p.m.  Once home, Piersall
again alternated between sitting, standing, and walking.  He ate dinner with
his family and went to bed about 8:00 p.m.  He used to help his children
with homework, but said he could not help once they reached the fifth
grade.  R. 700-02.  Piersall did not lift any heavy objects at home.  His wife
did the laundry.  He lifted a gallon of milk with two hands.  R. 710.  Piersall
used a lift chair instead of a regular recliner because the chair lifted him
and made it much easier to get up.  R. 710.

Piersall said he could not work because of his pain and stiffness and
bending and twisting caused his pain to flare up.  He said, "I'm just
completely exhausted – by – from just from doing, you know, nothing,
pretty much and just dealing with the pain and trying to get through the
day."  R. 702-03.  He said his stiffness caused problems going from sitting
to standing, "Like it's a rusted bike chain that's stuck at like a 90-degree

angle, and when I go to stand up, it's like forcing it to open, more or less. And that's kind of what I feel."  Once up, Piersall had to stand for a minute before he could start walking.  He said he held onto walls and countertops when he walked.  R. 711.  He did not need a cane, walker, or wheelchair to ambulate.  R. 707.

Piersall testified his inability to grasp objects with one hand started when he was 20 years old and that he had carpal tunnel syndrome.  He had difficulty holding small objects at work, including a hammer.  He said the problem got worse two years before the hearing.  His arms and hands tingled from the elbow down and he could not feel anything.  He also had cubital tunnel syndrome and had surgery to correct the problem, but he lost strength in his hands.  He could not tell how hard he was squeezing an object.  R. 703-04.  Piersall also said that his hands were swollen and ached all the time.  Counsel for Piersall stated that his hands were swollen at the hearing.  R. 708-09.

Piersall could not put on his own socks and his wife put them on for him.  He could reach up to wash his hair and he used a piece of wood with a puff ball on the end to wash his buttocks in the shower because he could not reach down that far. R. 711-12.

Piersall said he also had problems with his hips, more on the left side.
He had throbbing, shooting pains into his thigh almost like an electrical
shock.  Physical therapy aggravated the pain.  R. 705-06.

Piersall's medications took the edge off the pain, but made him
drowsy.  R. 706-07.  He said that Dr. Kraus recommended against another
back surgery and told him that surgery would make his condition worse.
Piersall said he was also told there was no surgical options for his neck
pain.  He received injections for pain, primarily in his neck.  His insurance
would not pay for injections in both his neck and his back.  He also used a
TENS unit and an inversion table.  He said these treatments gave
temporary relief, "more or less, a Band-Aid for that moment, I guess."  R.
709.

Vocational expert Johnson then testified.  Piersall stipulated to
Johnson's qualifications to testify as an expert.  The ALJ asked Johnson
the following hypothetical question:

> For the first hypothetical, I'd like you to assume a hypothetical
> individual of the Claimant's age, education, and with that past
> job we just discussed. Further assume this individual can
> perform work at the light exertional level. Can occasionally
> climb ladders, ropes or scaffolding, stoop, crouch or crawl. Can
> such a hypothetical individual perform any of the Claimant's
> past work?

R. 713.  Johnson said such a person could not perform Piersall's past relevant work.  Johnson opined that such a person could perform jobs such as housekeeping cleaner, with 133,000 such jobs in the national economy; marker, with 300,000 such jobs in the national economy; and order caller, with 11,000 such jobs in the national economy.  Johnson testified that person could perform these jobs even if he was further limited to never climbing ladders, ropes, scaffolding, and to never crawling.  Johnson opined that such a person could still perform these jobs even if he had to be able to change from sitting to standing up to every 30 minutes at work.  R. 714.  The person could also perform these jobs even if he was limited to frequent reaching, handling, fingering, or feeling with both upper extremities.  R. 715-19.

Johnson opined that a person could not work if he was absent from work one day a month for three consecutive months.  A person could not work if he needed to take more breaks than the regularly scheduled work breaks.  The person also could not work if he was off task for more than 15 percent of the time at work.  R. 720-21.  The hearing ended.

<u>THE DECISION OF THE ALJ</u>

On March 11, 2019, the ALJ issued her decision.  R. 670-80.  The ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that he is disabled regardless

of his age, education, and work experience.  20 C.F.R. §§ 404.1520(d),

416.920(d).  To meet this requirement at Step 3, the claimant's condition

must meet or be equal to the criteria of one of the impairments specified in

20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§

404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the

ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Piersall met his burden at Steps 1 and 2.  He had not worked from the Onset Date of September 1, 2011 through his Date Last Insured December 31, 2017.  He also suffered from the severe impairments of degenerative disc disease of the cervical and lumbar spine with L4-S1 herniations.  R. 672.

The ALJ found at Step 3 that Piersall's impairments or combination of impairments did not meet or equaled a Listing.  The ALJ considered the former Listing 1.04 for disorders of the spine.[10]  The ALJ found no medical evidence of spinal arachnoiditis, muscle atrophy, muscle strength deficits plus reflex or sensory deficits, or that Piersall was unable to ambulate effectively.  R. 674.

The ALJ then found that Piersall had the following RFC:

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light

---

[10] Effective April 2, 2021, Listing 1.04 was superseded by new Listing 1.15.  The new Listing 1.15 does not apply here because the new Listing only applies to decisions made by the Commissioner after the effective date.  85 Fed. Reg. 78164 n.2 (December 3, 2020).

work as defined in 20 CFR 404.1567(b) except he can never climb ladders, ropes, or scaffolds, or crawl. He can occasionally stoop and crouch, and work with an option to sit or stand, changing positions no more frequently than every 30 minutes, while remaining on task.

R. 674.  The ALJ relied on her examination of the medical records.  The ALJ reviewed the x-rays, MRIs, CT scans, and EMG studies.  The ALJ noted that Dr. Kraus advised that Piersall lose weight, stop smoking, and start exercising, and Piersall did not follow those recommendations.  The ALJ also examined the medical records.  The ALJ found the examinations showed largely normal findings with some exceptions:

> The record also reflects, since the alleged onset date, the claimant's physical examination findings have been largely within normal limits, except for obesity (with a body mass index ranging from about 38 to 44), spasms in his neck and back with a subjective decreased range of motion in his neck and back, decreased lower extremity reflexes, and subjective tenderness over his spine and rhomboid, scapular, and trapezius areas (Ex. 1F-7F, 12F-14F, 16F-21F). The record further reflects, since the alleged onset date, the claimant has only rather infrequently exhibited other abnormal findings, such as positive straight leg raise, wide-based and/or antalgic gait, difficulty getting on/off the exam table, difficulty tandem walking, inability to heel and toe walk, inability to squat and hop, decreased reflex in his upper extremities, increased muscle tone in his neck and back, positive FABER's/Patrick's tests, and decreased sensation in the *CS* dermatome, left hand, and all 5 fingers of the left hand (Ex. 1F-4F, 6F, 7F, 12F, 18F-21F).

R. 676.  The ALJ also noted that the medical records showed no evidence of "any muscle atrophy or significant deficits in muscle strength, grip

strength, or fine finger manipulative ability."  The ALJ additionally relied on the fact that Piersall did not use a cane, walker, or wheelchair to ambulate. The ALJ relied on the fact that the EMG study of the lower extremities was normal, and the EMG study of the upper extremities showed no evidence of cervical radiculopathy.  R. 676-77.

The ALJ relied on Dr. Kraus' opinion in May 2012 that Piersall could lift 25 pounds.  The ALJ also relied on the opinions of Drs. Arjmand and Kim.  The ALJ found greater restrictions in Piersall's RFC than reflected in the opinions of Drs. Arjmand and Kim because the two state agency doctors did not consider all the evidence in the file.  R. 677.

The ALJ did not give any weight to the Hartford insurance company determination that Piersall qualified for long term disability benefits from his work.  The insurance company only found that Piersall met the insurance policy's definition of disabled, not the definition under the Social Security Act and regulations. R. 677.

The ALJ did not give weight to Dr. Gregory's opinion that Piersall could not drive because he was using opioid pain medication.  The ALJ noted that Piersall drove his children to and from school every day without difficulty.  R. 677-78.

The ALJ did not give weight to Dr. Oligschlaeger's May 2016 opinion that Piersall would miss two or more days of work per month.  The ALJ said that Dr. Oligschlaeger did not provide any explanation for why Piersall would miss two days of work per month.  The ALJ agreed with Dr. Oligschlaeger's opinion that Piersall did not meet Listing 1.04 but noted that Dr. Oligschlaeger relied on the fact that Piersall could do some walking but did not define what he meant by the term "some" walking.  R. 678.

The ALJ did not give great weight to Piersall's statements about the effect of his symptoms. The ALJ found that the statements were not consistent with the medical evidence.  The ALJ also noted that Piersall worked for 10 years with the back pain before the Onset Date.  The ALJ also found that Piersall's testimony about his symptoms was not consistent with evidence in the Function Report that he performed household chores, gave his children baths, fished twice a month, and built radio-controlled cars once a month.  R. 676.

After determining the RFC, the ALJ found that Piersall met his burden at Step 4.  The ALJ found that Piersall could not perform his past relevant work.  The ALJ relied on the RFC determination and the opinions of vocational expert Johnson.  R. 678.

At Step 5, the ALJ found that Piersall could perform a significant number of jobs that existed in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2; the RFC determination; and the opinions of vocational expert Johnson that a person with Piersall's age, education, work experience, and RFC could perform representative jobs of housekeeping cleaner, marker, and order caller.  R. 678-79.  The ALJ concluded that Piersall was not disabled from the Onset Date through the Date Last Insured.  R. 680

Piersall appealed administratively.  On October 21, 2020, the Appeals Council found no basis to assume jurisdiction over this appeal.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 660-61.  Piersall then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to her conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision in this case was supported by substantial evidence.  The ALJ expressly considered the material evidence, including the medical evidence that contained abnormal findings such as positive straight leg raising, etc.  The ALJ also expressly considered all the imaging and EMG studies.  The ALJ explained why she concluded the evidence as a whole demonstrated that Piersall was limited to a narrow range of light work but did not show greater limitations.  This Court reversed the prior decision of the ALJ in 2016 because the ALJ did not discuss medical

evidence that showed abnormal findings.  See 2018 Opinion, at R. 930-32.
The ALJ corrected this error and explained her reasoning adequately.  A
reasonable person might accept the evidence on which the ALJ relied as
adequate, and so, the decision was supported by substantial evidence.
Richardson v. Perales, 402 U.S. at 401.

Piersall argues that the ALJ failed to follow the admonition in the
2018 Opinion to address the abnormal findings in the medical evidence.
The Court disagrees for the reasons discussed above.  The ALJ minimally
articulated her analysis of the relevant evidence including the abnormal
findings.

Piersall argues the ALJ erred by finding that Piersall had infrequent
medical treatment.  The ALJ made no such finding.  The ALJ found that
Piersall "rather infrequently exhibited other abnormal findings," (as quoted
above), but the ALJ did not find that Piersall had infrequent medical
treatment.  The argument, therefore, is unpersuasive.

Piersall argues that the ALJ erred by finding that the "absence of
muscle wasting as being determinative of a lack of symptomology."  Brief in
Support of Plaintiff's Motion for Summary Judgment (d/e 16), at 39.  The
ALJ again made no such finding.  The ALJ mentioned that the medical
record contained no evidence of muscle atrophy as one factor among

many.  R. 676.  The ALJ did not find that a lack of muscle wasting, by itself, was determinative, so this argument is also unpersuasive.

Piersall also quotes extensively from a <u>Steve S. v. Saul</u>, 2020 WL 4015332 (N.D. Ill. July 16, 2020).  The Northern District in <u>Steve S.</u> found that the ALJ did not adequately articulate his analysis of whether the claimant's impairments met Listing 1.04.  <u>Id.</u> at *4.  Here, the evidence clearly supported the ALJ's finding that Piersall's spinal impairments did not meet or equal former Listing 1.04.  Listing 1.04 provided:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 Listing 1.04.   To meet or equal Listing 1.04 (A), Piersall needed evidence that he had pain and motor loss and either sensory loss or reflex loss.  He had no evidence of motor loss and little or no evidence of sensory loss or reflex loss.  To meet Listing 1.04(B), Piersall needed specific types of evidence of spinal arachnoiditis.  He had no such evidence.  To meet Listing 1.04(C), Piersall needed evidence that he could not ambulate effectively.  He walked without a cane or walker.  Piersall had no evidence that he met or equal Listing 1.04.  The Steve S. case does not apply.

Piersall last asks the Court to award benefits.  The request is denied because the decision of the ALJ was supported by substantial evidence.

THEREFORE, IT IS ORDERED THAT the Defendant Acting Commissioner's Motion for Summary Affirmance (d/e 21) is ALLOWED; Plaintiff Bradley J. Piersall's Motion for Summary Judgment (d/e 15) is DENIED, and the decision of the Defendant Acting Commissioner is AFFIRMED.  THIS CASE IS CLOSED.

ENTER:   March 23, 2022

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE

Page **53** of **53**